1

1          UNITED STATES DISTRICT COURT
                DISTRICT OF NEVADA
2       BEFORE THE HONORABLE ROBERT J. JOHNSTON
                  MAGISTRATE JUDGE
3

4  ROBERT BOSCH, LLC,              :
                                   :
5           Plaintiff,             :
                                   :  No. 2:10-cv-01924-RLH-RJJ
6       vs.                        :
                                   :  July 1, 2011
7  COREA AUTOPARTS PRODUCING       :
   CORPORATION d/b/a CAP           :  Las Vegas, Nevada
8  AMERICA,                        :
                                   :
9           Defendant.             :
   _____ :
10

11

           TRANSCRIPT OF TELEPHONIC CONFERENCE CALL RE:
12                  MOTION TO COMPEL [47]

13

14
   APPEARANCES:
15
   For the Plaintiff:        JENNIFER BRASTER, MARK HANNEMANN,
16                           JEFFREY GINSBERG, RICHARD COWELL
                             Attorneys at Law
17

18  For the Defendant:       MARC LORELLI, DOUGLAS COHEN,
                             JOHN RONDINI, JOHN HALAN
19                           Attorneys at Law

20
   FTR No. RJJ/20110701
21
        (Transcript produced from digital voice recording;
22           transcriber not present at proceedings)

23
   Transcribed by:          Donna Davidson, RDR, CRR, CCR 318
24                           Certified Realtime Reporter
                             400 South Virginia Street
25                           Reno, Nevada  89501
                             (775) 329-0132

2

1          LAS VEGAS, NEVADA, JULY 1, 2011, 10:09 A.M.

2                        --oOo--

3                 P R O C E E D I N G S

4

5          THE COURT:  Good morning.  This is Judge

Johnston in the case of Bosch versus Corea Auto Parts.  This

is case number 2:10-cv-1924-RLH-RJJ.

8          Counsel, if you'll please enter your appearances

for the record.  Please indicate the party or parties that

you represent, any law firm that you're associated with, and

the city and state that you're in for the call this morning.

Starting with plaintiff's counsel, please.

13         MR. HALAN:  Hello, Your Honor.  This is John --

I'm sorry.  Excuse me.

15         UNIDENTIFIED SPEAKER:  Jennifer, do you want to

start?

17         MS. BRASTER:  Yes, I'll start.

18         Good morning, Your Honor.  This is Jennifer

Braster, with Lionel, Sawyer and Collins, counsel for

plaintiffs.  And I am in Las Vegas, Nevada.

21         THE COURT:  Thank you.

22         MR. HANNEMANN:  Mark Hannemann and Richard

Cowell of Kenyon & Kenyon, also for plaintiff Bosch, both

sitting in New York.

25         MR. GINSBERG:  And this is Jeff Ginsberg of

1  Kenyon & Kenyon for plaintiff Robert Bosch.  And I'm calling

2  in from a deposition that's taking place in Chicago.

3           THE COURT:  Thank you.

4           On the defense side?

5           MR. HALAN:  Yes, hello, Your Honor.  This is

6  John Halan.  I'm with the law firm Brooks Kushman in

7  Southfield, Michigan.  And we represent the defendant CAP

8  America.

9           I'm accompanied here by Marc Lorelli and John

10 Rondini.

11          MR. COHEN:  This is Douglas Cohen from Jones

12 Vargas.  We're local counsel for the defense calling from Las

13 Vegas.

14          THE COURT:  You want to say that again,

15 Mr. Cohen?  You're breaking up really bad.

16          MR. COHEN:  Yes.  This is Douglas Cohen from

17 Jones Vargas in Las Vegas for the defense.  Local counsel.

18          THE COURT:  Okay.  Are you on a cell phone?

19          MR. COHEN:  No, I'm on regular phone.

20          THE COURT:  Okay.  Very good.

21          If each time anybody speaks, if you'll just

22 identify yourself, that will help the recorder to keep track

23 of everybody.  And we'd appreciate that.

24          This is on for a hearing in regard to a motion

25 to compel that's been filed by the defendants.  And I

4

1 guess my first question is have you resolved any of the

2 matters that are identified at issue in the motion to

3 compel?  And the reason I ask that, in particular, is that

4 it looks like there's a -- are we getting some feedback

5 from something?

6            THE CLERK:  It sounds like we are feeding back,

7 Your Honor.

8            THE COURT:  Yes.  Anyway, it looks like there

9 were a lot of documents that were not searchable and that

10 they hadn't fully been looked at yet; and so I'm wondering if

11 maybe the motion was a little premature.

12            But perhaps you can all bring me current on

13 where things stand.

14            MR. HALAN:  Your Honor, this is John Halan.

15 Nothing has been resolved between the parties.  But there is

16 one issue that has become somewhat moot, and that is the

17 issue of the identification of documents responsive to

18 requests or the requested documents be produced in some sort

19 of native format.

20            Since we filed our motion, we went ahead and

21 bought software necessary to convert those files into some

22 readable format.  We also bought software to be able to

23 read them.  And we have reviewed them substantially.  But

24 other than that, there's been no resolution.

25            And, in fact, in May I had some correspondence

1  with opposing counsel and asked them if there was any of

2  these issues that they would agree with, and they said no.

3  THE COURT:  Okay.  And so as you've been able

4  now to convert those documents to a readable format, does

5  that resolve any of the issues?

6  MR. HALAN:  Other than that issue itself, no.

7  THE COURT:  Okay.  All right --

8  I guess my -- then a threshold question here is

9  maybe someone ought to tell me a little bit about your meet

10  and confers because it was a very cryptic presentation, if at

11  all, that kind of falls in the body.  There was no separate

12  certification, as required by the rules, and I couldn't

13  really tell how thorough you had been in your conversation

14  and discussions.

15  MR. HALAN:  Well, first, Your Honor, we wrote

16  them a letter, that's Exhibit 1, outlining what we believe to

17  be deficiencies in the discovery, including the issues at

18  issue today.  And that was on April 7th.

19  THE COURT:  Okay.  But tell me about when you

20  actually talked about these things, what happened?

21  MR. HALAN:  That was between April 7th and April

22  28th, 2011.

23  MR. LORELLI:  Sure, this is Marc --

24  MR. HALAN:  Actually, Marc Lorelli is here, and

25  he was the one actually on the telephone call, and he can

1    probably better address that more accurately.

2            MR. LORELLI:  Yes, Your Honor.  The issues were

3    discussed, and the results of that conference were recorded

4    in my letter of April 28th, 2011, which also indicates that

5    there was a -- that indicates that it was setting forth and

6    memorializing what happened in the conference.  And that

7    letter is Exhibit 2.

8            But, primarily, the issues that are still at

9    issue today are the same issues that were discussed.  And

10   they start with the issue of what we believe is improperly

11   limiting the scope of our document request to the LLC,

12   when these patents were owned, up until recently, by the

13   GmbH.

14           THE COURT:  Okay.

15           Does somebody on the other side want to speak to

16   that issue?

17           MR. HANNEMANN:  Yes, Your Honor.  This is Mark

18   Hannemann from Kenyon for the Bosch plaintiff.  We, as I'm

19   sure Your Honor could tell from the papers, don't agree with

20   many of the characterizations of what happened during the

21   conferences between Mr. Ginsberg and the CAP lawyers.  And we

22   also don't understand there to be any remaining concrete

23   discovery issues between the parties.  When CAP identifies

24   issues, Bosch has responded and searched for and produced

25   documents.

1           On the particular issue of the German company,

2  the plaintiff in the case is a U.S. company, Bosch, LLC,

3  that's owned by a German parent corporation.  The

4  inventions were made by folks employed by the German

5  parent corporation many years ago.

6           Bosch, LLC, does not have the power to obtain

7  any particular documents from Bosch GmbH, but Bosch GmbH

8  is cooperating in litigation voluntarily.

9           And as detailed I think in a declaration from

10  Bosch, LLC's in-house counsel, and as explained numerous

11  times during the conferences between the parties, Bosch,

12  LLC, has asked GmbH to look for documents in all these

13  categories.  And a large part of Bosch, LLC's, document

14  production in this case is documents that have been

15  obtained and produced -- obtained from GmbH and produced

16  voluntarily.

17           So GmbH has searched its files for all these

18  things, and we've given -- we, on behalf of Bosch, LLC,

19  have produced the results to the defendants.

20           We've also prepared a privilege log, even, of

21  documents being withheld by the German company on the

22  grounds of privilege.

23           The only issue that I'm aware of that's still

24  outstanding is full copies of some design patents.  And

25  Bosch, LLC, has asked for those.  GmbH has agreed to

1   produce them.  And we've produced, or will produce, the

2   documents we have so far.  There's a few more coming.

3            And as GmbH turns up additional documents from

4   their archives, because they're going back for second and

5   third passes, if there's anything new, we're going to

6   produce that.

7            THE COURT:  Okay.  I believe I saw some

8   indication of something like 900,000 pages of documents; is

9   that correct, at this point?

10           MR. HANNEMANN:  What's been produced is

11  something in the 800,000s of pages of documents, I believe.

12  The bulk of that production is the litigation file from the

13  previous case relating to some of these patents that Bosch,

14  LLC, brought in Delaware against another infringer and

15  litigated -- you know, litigated all the way through a jury

16  verdict of infringement that's up on appeal now.

17           So there's -- you know, we produced all the

18  paperwork from that case, as well as all of the -- you

19  know, all of the discovery from that case, which is

20  essentially the same subject matter that the CAP

21  defendants are interested in.

22           I mean, and those files were specifically

23  requested.

24           THE COURT:  Okay.  All right.

25           Mr. Halan, do you want to kind of lead us

1  through where you see issues that we can address today.

2  And let's tackle some of these and see if we can knock

3  them out.

4          MR. HANNEMANN:  Well, I would like to say

5  something about the document production format issue, because

6  that really was a non-issue from the beginning.  We had an

7  agreement on the format the documents were to be produced in.

8          THE COURT:  Right.  I don't think we need to go

9  there, because that's been resolved.  Let's just move on to

10  what's at issue.

11          MR. HANNEMANN:  Okay.  Well, I don't understand

12  anything to be at issue, specifically, anymore.

13          THE COURT:  Okay.

14          MR. HALAN:  Okay.  Your Honor, one of the first

15  issues with these -- with the German parent company

16  documents --

17          THE COURT:  Who is speaking now?

18          MR. HALAN:  I'm sorry.  This is John Halan, Your

19  Honor.

20          THE COURT:  Okay.  All right.  Mr. Halan, what

21  do you want to tackle first?

22          MR. HALAN:  Tackle the German parent company

23  documents.  And there's several issues.

24          THE COURT:  All right.  So why don't you refer

25  us to an exhibit that has the responses and so we can all

1  focus on the same thing and the record will reflect what

2  we're looking at.

3          Do you want to start with the request to

4  produce or the interrogatories?

5          MR. HALAN:  One of the first things, Exhibit 3,

6  was their letter in response to our letter where we said

7  there was still a dispute as to certain discovery.

8          THE COURT:  Right.  I'd rather just go directly

9  to the requests or the interrogatories.  That's going to be a

10  much more workable start than the letters.

11          The letters are kind of preparatory, in my

12  opinion.  I hope that they've been refined more as you've had

13  the personal meet and confer.

14          So let's go directly to those issues that are

15  still pending between the parties.

16          MR. HALAN:  Well, Your Honor, I don't mind

17  doing that.  But, again, our position is that there hasn't

18  been documents produced, a large number of the requests,

19  and --

20          THE COURT:  That's okay.  We'll take them one by

21  one.  I've got all day.

22          Pick your first one.  Let's go.

23          Mr. Halan?

24          MR. HALAN:  Yes, I'm -- I'm sorry, Your Honor.

25  That's -- the issues are broader than that, so --

1      THE COURT:  It just tends to generally work

2  better if we go back to what the original request was and

3  what the response was, and then you can identify the

4  deficiency, we can have a conversation about what the meet

5  and confer fleshed out and then what might be left.  And then

6  the Court can rule one way or the other on the issue.

7      So if you kind of bear with me and endure

8  through this process, I appreciate it.

9      MR. HANNEMANN:  Your Honor, I don't mean to

10  interrupt.  This is Mark Hannemann again.  I don't believe

11  there really was any real meet and confer after these letters

12  were exchanged.

13      And we have been and remain willing to talk

14  about the issues directly to CAP's counsel, if there are any

15  other issues.

16      THE COURT:  Okay.

17      MR. HANNEMANN:  I don't want to interrupt the

18  process, but I just wanted to point that out.

19      THE COURT:  Okay.  Well, that's consistent with,

20  kind of -- as I reviewed this and looked at various things

21  that are attached, I had big questions about whether or not

22  there had been meet and confer.  But I think we'll really see

23  that when we start talking about individual items.

24      Mr. Halan, do you want to grab the lead here

25  and take off?

1          MR. HALAN:  Yeah, Your Honor.  We would start

2   with request for production number 4.  And that's going to

3   refer to Exhibit Number 7.

4          THE COURT:  Okay.  Exhibit Number 7.  Which page

5   should we be on?

6          MR. HALAN:  That would be page 4.

7          THE COURT:  Okay.  Why don't you just summarize

8   what the request was seeking?

9          MR. HALAN:  Well, it's seeking redactments

10  regarding -- assortment of information regarding Beam wiper

11  blades, in general, which is more than just wiper blades

12  covered by the patents-in-suit.

13          THE COURT:  Okay.

14          MR. HALAN:  And one of the biggest problems

15  here -- and this is where I go back to my (indiscernible)

16  school, is that according to the letter that Bosch sent us,

17  and according to the declaration notice submitted from their

18  chief litigation counsel, they only requested Bosch GmbH to

19  look for documents relating to the patents-in-suit.  And

20  that's one of the biggest problems.

21          THE COURT:  Okay.  So tell me a little about

22  when you had the meet and confer how you dealt with this

23  issue and explained it to other counsel.

24          MR. LORELLI:  Yes, Your Honor.  This is Marc

25  Lorelli.  The issue came about because of the fact that these

1    patents were apparently invented by German and Belgium

2    employees who worked for the GmbH company.

3            We asked for a lot of information, including

4    testing, manufacturing, invention disclosures, which are

5    all encompassed within document request number 4.

6            And the response that we got back is we'll

7    give you some documents -- or we'll request some documents

8    that relate to the patents-in-suit.

9            Our requests are much broader than that.  And,

10   of course, we want some understanding or an order as to

11   what the German parent must do in this case.  We don't

12   think that a German parent can transfer the

13   (indiscernible) subsidiary and then avoid (indiscernible)

14   to document interrogatory such as the one we're talking

15   about.

16           THE COURT:  Okay.  What's the relevance of the

17   other wiper blades here as opposed to those that are related

18   to the patent-in-suit?

19           MR. HALAN:  Because these are wiper blades, Your

20   Honor.  They would constitute prior art.  And there's a --

21           THE COURT:  Who's speaking?

22           MR. HALAN:  I'm sorry.  This is John Halan

23   again.

24           THE COURT:  Okay.  Go ahead, please, Mr. Halan.

25           MR. HALAN:  These other wiper blades could or

1   would constitute prior art.  And the disclosures of those

2   prior art could invalidate the patent-in-suit.

3            It's not up to us to unilaterally decide what

4   they believe is related to patentability or related to the

5   claims.  (Indiscernible) that information ourselves determine

6   whether or not they'd invalidate the claims.

7            And, in particular, Your Honor, one of the

8   biggest issues here is that Bosch -- first of all, out of

9   that first production of documents, only about 4,000

10  documents came from the Bosch German company.  And their

11  documents -- they have a number of documents that are 1996

12  and earlier; and they have a number of documents from 2001

13  and later.

14           There's a period of five years in between

15  where they produced virtually nothing, and that's when the

16  Aerotwin blade was being developed and first being sold,

17  which is key to this case.  It's our position we believe

18  the Aerotwin blade invalidates the patent-in-suit.

19           And that's the blade we -- in our patent -- in

20  our brief that was introduced in 1998 or 1999, and it was

21  shown at the auto show here in the United States in 1999.

22           (Indiscernible) almost nothing about the

23  Aerotwin blade during that period.  And that information

24  would be in the possession of the German parent company.

25           THE COURT:  Okay.  All right.

1        Somebody from the plaintiff.  Mr. Hannemann,

2  do you want to speak to this?

3        MR. HANNEMANN:  Yes.  Yes, Your Honor.  We have

4  already agreed to search for and produce all documents

5  relating to wiper blades before the U.S. filing date of these

6  patents, which would include the time period that CAP's

7  counsel just referred to.  And we have produced what there

8  is.  We're continuing to look and will produce more.

9        The Aerotwin blade -- and, in parentheses, I'll

10  say that the Aerotwin blade that they identified -- that CAP

11  identified in its motion -- its reply to the motion to

12  compel, which they never asked us about before filing the

13  reply, is a different design than the one that was sold in

14  the time period that he's talking about.

15        But, obviously, the documents and witness

16  testimony on that are what they are, and we are not

17  withholding them.

18        THE COURT:  Okay.  Is there a projected date for

19  completing the search and producing those documents?

20        MR. HANNEMANN:  At least two searches have

21  already been completed.

22        And if I could have one second, let me confirm

23  that all -- everything that has turned up has been produced.

24        THE COURT:  Okay.

25        MR. HANNEMANN:  Okay.  We did -- the German

1   company did just provide us here in the United States with

2   another set of results from going through their files and

3   archives, which we are reviewing here now, and that will be

4   produced shortly.

5                THE COURT:  Okay.

6                MR. HANNEMANN:  And I think it's the third

7   search.

8                THE COURT:  Okay.  Very good.

9                Mr. Halan, Mr. Lorelli, do you want to move on

10  to the next item.

11               MR. HALAN:  Okay.  Your Honor, this is John

12  Halan.  That's the first time Bosch has ever said that they

13  would comply.

14               So I assume they are going to comply with our

15  request for production number 4 with regard to the German

16  parent company.

17               THE COURT:  Okay.  Sounds like there's some

18  things coming there, and so you should be able to see those

19  pretty soon.  And then you'll be able to measure whether or

20  not you've got everything you need from the previous patents,

21  including all the presentations.

22               What's the next one?

23               MR. HALAN:  Well, the next one's kind of

24  related.  It's request for production number 8.  And that's

25  regarding the commercial exploitation of the same products

1  that were at issue with request number 4.

2              THE COURT:  Okay.

3              MR. HALAN:  And those early sales records and

4  things of that nature would also be incredibly critical in

5  this case.

6              THE COURT:  Okay.

7              Mr. Hannemann?

8              MR. HANNEMANN:  Our answer to that is the same,

9  Your Honor, as for the previous request.

10              THE COURT:  Okay.

11              What's next, Mr. Halan?

12              MR. HALAN:  Next would be request for production

13  number 9.  And again that's referring to windshield wiper

14  products, early windshield wiper products having certain

15  characteristics.  And actually that's 9 and 10.

16              And, again, those are characteristics that are

17  claimed in the patents-in-suit.  And we're trying to find

18  out if there's prior art that disclosed those

19  characteristics.

20              THE COURT:  Okay.  All right.

21              Mr. Hannemann, do you want to speak to this

22  one?

23              MR. HANNEMANN:  I do, Your Honor.  I'm looking

24  at this request, to make sure I understand which one this is.

25              And, again -- I mean, on this one we have not

18

1    committed to testing every prototype or every sample wiper

2    blade that we have, but we have, again, agreed to produce any

3    documents that we have describing any of these

4    characteristics.

5              And I think that that's a -- I think that's a

6    fair summary of where we are.

7              THE COURT:  Okay.

8              Mr. Halan.

9              MR. HALAN:  Okay.  Well, I assume what they've

10   just said they're going to agree to produce, that will be

11   part of this order?  Because they've never said that before

12   to us.

13             THE COURT:  Okay.  All right.  Let me just ask a

14   question here, Mr. Halan, because one of the responses you

15   got was that this request was vague and overly broad and

16   unduly burdensome.

17             So I assume in your meet and confer you had a

18   discussion, and you said, okay, Mr. Hannemann, or someone,

19   tell me what's vague about this request.

20             MR. HANNEMANN:  That's, you know, if

21   Mr. Ginsberg is still on the line, he can discuss in more

22   detail than I, because he conducted them, the discussions.

23             But, again, my understanding is that the

24   discussions were limited and really were not having the kind

25   of conversation that we're having today.

1      But Mr. Ginsberg can -- if he's still on the

2  line, can jump in and testify about --

3      MR. GINSBERG:  I --

4      THE COURT:  Let me ask Mr. Lorelli, if I could.

5  Because I guess, Mr. Lorelli, you were conducting the meet

6  and confer?

7      MR. LORELLI:  Yes, Your Honor.

8      THE COURT:  Great.  Why don't you tell me --

9      MR. LORELLI:  On the document request issues,

10  they focused on the issues of the German parent not producing

11  documents or producing limited documents.

12      THE COURT:  Okay.

13      MR. LORELLI:  With regards to this document

14  request number 9 and 10, they're actually very related to

15  interrogatories number 9 and 10, which were discussed.  The

16  objections were discussed, and Bosch specifically told us

17  they would not be providing responses to those

18  interrogatories.

19      The interrogatories and document requests are

20  almost verbatim for 9 and 10.

21      THE COURT:  Okay.  So you had no problem with

22  the objection of vagueness, overbroad, unduly burdensome?

23      MR. LORELLI:  The actual -- the language, as we

24  discussed, comes right from their patent claims.

25      So if our objection -- or, I'm sorry, if our

20

1    document request is vague, so is their patent claims, and

2    then they'd be rendered indefinite.  But the issue --

3             THE COURT:  You may have a different standard to

4    test that by.  I'd be -- I'd caution you about making that

5    assumption.

6             MR. LORELLI:  Well, true, Your Honor.  But my

7    point there is that the response that we weren't -- we were

8    not going to be provided with a response -- with an answer to

9    interrogatories number 9 and 10 was provided not on the basis

10   of vagueness.

11            THE COURT:  Okay.

12            MR. LORELLI:  And --

13            THE COURT:  All right.

14            MR. GINSBERG:  Your Honor, this is Jeff

15   Ginsberg.  And I'm sorry I'm not taking the lead on this.

16   I'm out of the office.  I'm on my fourth day in a row of

17   taking depositions of foreign language witnesses, so I'm a

18   little under the gun.

19            That said, as Mr. Lorelli stated, that

20   specific objection that we raised concerning the breadth

21   of this overly broad request was not discussed in response

22   to the interrogatories that Mr. Lorelli identified.  We

23   did object on the grounds that it was vague and overly

24   broad.

25            And this was not discussed with me during any

1  of the conversations that I had with Mr. Lorelli.

2              THE COURT:  Okay.

3              MR. GINSBERG:  And we did provide a response to

4  the best that we could understand this extremely long, and

5  somewhat convoluted, interrogatory.  We did provide a

6  response.

7              THE COURT:  Okay.  Very good.

8              Mr. Halan, let's move on to the next item then.

9              MR. HALAN:  Okay, Your Honor.  The next item

10 would be number 14.  That's document request number 14.

11             THE COURT:  Okay.  This is related, again, to

12 prior art as well as the patent-in-suit?

13             MR. HALAN:  Yes.  And this is between -- this is

14 involving any comparisons between such prior art and anything

15 in the patents -- or the products of the patents-in-suit.

16             And, again, the way Bosch has limited their

17 response, they're only producing materials related to the

18 patents-in-suit, and I just want to make sure if there are

19 any such comparisons that we will get them from the Bosch

20 GmbH parent company.

21             THE COURT:  Okay.  Who will speak for the

22 plaintiff?

23             MR. HANNEMANN:  I will, Your Honor.  Mark

24 Hannemann.  Again, anything that -- any responsive documents

25 that can be identified, Bosch will either produce or log and

1  should have already been produced or logged, although I will

2  confirm that.

3          THE COURT:  Okay.

4          MR. HANNEMANN:  This is not an issue that I

5  recall ever -- ever coming up.

6          I mean, we may want to put a date restrictor on

7  it so that we don't have to log every e-mail relating to the

8  ongoing litigations.

9          But in terms of -- in terms of, you know,

10  documents that would normally be the subject of discovery, I

11  don't even understand it to be an issue.

12          THE COURT:  Okay.

13          Anything further?

14          MR. HALAN:  Document request number 23.

15          THE COURT:  Request to produce number 23,

16  Mr. Halan?

17          MR. HALAN:  Yes.  This is on page 18.

18          THE COURT:  Okay.

19          MR. HALAN:  This goes to document retention

20  policies.

21          And I think in this case it's particularly

22  important to get whatever retention policies the parent

23  company has, since it looks like there's been a number of

24  years where documents have either been lost or destroyed.

25          THE COURT:  And your conversation with the

1   attorneys on the other side brought you to this conclusion?

2           MR. HALAN:  Well, again -- again, they were

3   refusing to produce anything from the parent company, except

4   for anything relating to the patent-in-suit.  So this would

5   have been excluded from their definition.  And this was

6   excluded from what they sought from Bosch GmbH, the parent

7   company, as set forth in the declaration of their chief

8   litigation officer.

9           THE COURT:  Okay.  Sounds like I've heard a

10  little change in that position today.

11          Mr. Hannemann?

12          MR. HANNEMANN:  Your Honor --

13          MR. GINSBERG:  Your Honor, this is Jeff -- Your

14  Honor, this is Jeff -- sorry, Mr. Hannemann.  If I could just

15  jump in.

16          THE COURT:  Who is this?

17          MR. GINSBERG:  Because I was involved in the

18  discussions with Mr. Lorelli and Mr. Halan --

19          THE COURT:  Excuse me.

20          MR. GINSBERG:  -- and they --

21          THE COURT:  Excuse me.

22          MR. GINSBERG:  -- had never raised --

23          THE COURT:  Excuse me.

24          MR. GINSBERG:  -- it at all.

25          THE COURT:  Excuse me.

1          MR. GINSBERG:  Oh, I'm sorry, Your Honor.

2          THE COURT:  Who is jumping in?

3          MR. GINSBERG:  Oh, I apologize.

4          THE COURT:  And I'd appreciate --

5          MR. GINSBERG:  Jeff Ginsberg for plaintiff.

6          THE COURT:  Mr. Ginsberg, I'd just appreciate it

7   if you would help me maintain some order here and coordinate

8   with your counsel on the other side.

9          I mean, if Mr. Hannemann wants to hand it to

10  you, that's fine.  But, you know, there are five of you on

11  that side.  It's a little difficult to manage all five of

12  you.  I expect you to do that.

13         MR. GINSBERG:  I apologize, Your Honor.

14         THE COURT:  Mr. Hannemann, will you or Ginsberg

15  speak on this issue?

16         MR. HANNEMANN:  Yes, I will speak, and then I'll

17  give Mr. Ginsberg an opportunity, if necessary, to correct

18  me.

19         THE COURT:  Thank you.

20         MR. HANNEMANN:  But the only two things that I

21  wanted to say in response to past arguments and Your Honor's

22  comment was, number one, what we're discussing today does not

23  represent a change in Bosch's position of any kind.

24         And I'd also like to point out that this

25  request for production was never discussed with us before

25

1    this moment.

2              THE COURT:  Thank you.  Any need for

3    Mr. Ginsberg --

4              MR. HALAN:  This is John Halan.  May I respond?

5              THE COURT:  Any need for Mr. Ginsberg to chime

6    in then?

7              MR. GINSBERG:  Your Honor, I think Mr. Hannemann

8    handled it perfectly.

9              THE COURT:  Thank you.

10             Mr. Halan?

11             MR. HALAN:  Yes, Your Honor.  They're correct in

12   saying that this request was not specifically discussed.  And

13   that's because it was Bosch's position that they weren't

14   going to produce anything from the parent company excepting

15   documents relating to the patents-in-suit.  Again, it's set

16   forth in their brief, it's set forth in the response, and

17   it's set forth in the declaration of their chief litigation

18   officer.

19             This is the first time today that

20   (indiscernible) deposition, and since that exclusion

21   excluded a response to this request, they just naturally

22   fell under that.

23             THE COURT:  Well, now, just so I'm clear,

24   Mr. Halan, has the defendant received no documents from GmbH

25   through LLC?

26

1        MR. HALAN:  Your Honor, we have received

2   about -- out of the almost 900,000 documents, only 4,000 came

3   from the parent company.

4        THE COURT:  Okay.  So there were some documents

5   produced from the parent company?

6        MR. HALAN:  Yes, Your Honor.  But, again, what's

7   bizarre about it, again, there is a number of documents

8   produced from 1996 and earlier regarding what's called the

9   Variflex design.  That's an earlier design.

10        THE COURT:  I understand.

11        MR. HALAN:  The key design we're concerned with

12   was the Aerotwin, which was developed during the late '90s.

13   And all the documents that would be important to the suit

14   between 1996 and 2001 are just gone.  They produced very,

15   very little.  There's a smattering of just very, very -- a

16   handful of documents.

17        THE COURT:  Okay.  And so when you had a meet

18   and confer and you talked about the shortage of documents

19   for that period of time, what was the nature of the

20   conversation?

21        MR. HALAN:  At that time, Your Honor, they

22   hadn't produced anything.  You've got to remember they --

23   well, the parent company had produced -- oh, they produced

24   two documents?

25        Oh, at that time, they had only -- they hadn't

1  produced these documents that we're talking about now,

2  they produced 2000.  We're just starting to learn things

3  right now in a small handful.  We didn't have it at the

4  time of the conference.

5              THE COURT:  Okay.  Let's move on.

6              Mr. Halan, what's next.

7              MR. HALAN:  I have two other issues.  It's kind

8  of related.

9              In their production that they're agreeing to do,

10 I assume that they're going to agree to  produce the

11 documents pertaining to European activities.

12             THE COURT:  I'm sorry.  You're not coming in

13 very clear.

14             If you could re-state that, please, and direct

15 us to the request you're referencing.

16             MR. HALAN:  Well, no, this is going back to the

17 request we've already discussed.  They've agreed to produce

18 documents, for example, regarding these Beam wiper blades,

19 these early -- and in the past, they've taken the position

20 that they're not relevant unless they're in the U.S.

21             And I assume that their production is going to

22 include documents pertaining to their early sales, marketing,

23 advertising, everything in Europe or elsewhere outside the

24 U.S.

25             THE COURT:  Mr. Hannemann, do you want to

28

1   respond to that?  It sounds like we're having the meet and

2   confer here today.

3             MR. HANNEMANN:  Yes, Your Honor.  I'm not

4   aware -- I'm not quite sure what we're talking about right

5   now.  I will say that it does not seem reasonable that Bosch

6   GmbH produce every sales record or invoice it has of every

7   sale it's made in Europe.

8             But, on the other hand, anything that could

9   potentially be prior art activity is certainly fair game for

10  discovery, and we would certainly produce.

11            THE COURT:  Okay, good.  Then let's move on.

12            Mr. Halan, what's next?

13            MR. HALAN:  Your Honor, I think we could move on

14  to the interrogatories.

15            THE COURT:  Okay.  Which exhibit?

16            MR. HALAN:  The interrogatories and the

17  responses are number 9.

18            THE COURT:  Okay.

19            MR. HALAN:  In fact, a better exhibit is Exhibit

20  13, because that includes the supplemental responses.

21            THE COURT:  It includes what?

22            MR. HALAN:  The supplemental responses.  So

23  Exhibit 13 that we filed under seal.

24            THE COURT:  I don't see number 13.

25            MR. HALAN:  It was filed later.

1          THE COURT:  Which document is that?  I've got --

2  under seal I've got 11 and 12 supplemented.

3          MR. HALAN:  Well, you know what, Your Honor,

4  Bosch also filed it as an exhibit -- you can use theirs, too.

5  Exhibit Number 9, I believe.  It was Exhibit Number 9 to

6  their response.

7          THE COURT:  Okay.  Go ahead, please.

8          MR. HALAN:  Okay.

9          THE COURT:  Which interrogatories --

10          MR. HALAN:  We'll start off with interrogatory

11  number 3.

12          Actually this -- yeah, wait.  I'm sorry.  This

13  will not help us with interrogatory number 3.  I'm looking at

14  the wrong one, Your Honor.  I'm sorry.

15          THE COURT:  Okay.  Do you want to go back to

16  Exhibit 9 then?

17          MR. HALAN:  Well, Exhibit Number 9 will at least

18  give us what the requests are, yes.

19          THE COURT:  Okay.

20          MR. HALAN:  There is an Exhibit 13 that we filed

21  later.  I don't have the docket number for that, but I have

22  it here.

23          Okay, Your Honor.  So this is directed to

24  information regarding the products that are covered by the

25  patent-in-suit.

1     THE COURT:  Okay.  What are the deficiencies

2     here?

3          MR. HALAN:  Well, this asks them to identify the

4     product.  They've done that.  This asks them to identify

5     which claims cover the product.  They've done that.

6          They have not identified which -- the first

7     vehicle sold with the product, nor have they identified all

8     programs or all vehicles on which the product was sold.

9          Bosch, in their response brief, they simply

10    argue that it lacks relevance because numbers sold before the

11    priority date.

12          There's two problems with that argument, Your

13    Honor.  First of all, we have a right to at least get the

14    first sales dates to confirm whether or not that was the

15    actual first sales date.  And also --

16          THE COURT:  Okay.  So let me ask you a question,

17    if I could, Mr. Halan.  When you raised that question and you

18    had your meet and confer, what was the response when you

19    said, you know, we really need to know the first date and

20    product that this was on?

21          MR. LORELLI:  Yes, Your Honor.  This is Marc

22    Lorelli speaking.

23          THE COURT:  Yes.

24          MR. LORELLI:  And the issue here was -- it's,

25    again, it's the U.S. versus the German issue, that the German

1   information was not going to be provided, and that, as told

2   through the supplemental response, which was given to us

3   later, they've only provided information for the U.S.

4          In fact, they say the Aerotwin was first sold in

5   the United States in May of 2002 in their supplemental

6   response.  But we know from our own investigation that that

7   product was sold in Europe years before that.

8          THE COURT:  Okay.

9          Mr. Hannemann?

10         MR. HANNEMANN:  The product certainly was sold

11  in Europe before it was introduced to the United States.

12         In our supplemental response, we identified

13  documents that I believe include the vehicle application

14  guide that would explain which model years of which cars

15  which blades were installed on.

16         I don't know, sitting here today, whether those

17  application guides included European information or not.  We

18  will seek out that information and find out.

19         I am not sure at all of the relevance of sales

20  in Europe, since those are not prior art activities.  But we

21  could work to identify the car models -- if we haven't

22  already, and we may well have in these application guides, I

23  just don't know, we could work to find out what car models in

24  Europe those were on.

25         But, again, I think that's really of limited

32

1   relevance, unless there's an associated publication, or

2   something, which has never really been alleged.

3              And, you know, again this is not a -- this is

4   not an issue that we've really explored.  I'd like the

5   opportunity to make sure that I know before I said --

6   before I say we haven't produced something, because I

7   think that we have.

8              THE COURT:  Okay.  Very good.

9              What's next, Mr. Halan?

10             MR. LORELLI:  Your Honor, this is Marc Lorelli

11  again.  If I may respond to that.

12             We don't have from them, or in the documents

13  that they have identified, European applications for these

14  products.  And it -- as noted in our reply brief, we have

15  information that those were sold to certain Mercedes Benz

16  vehicles in Europe prior to the U.S. bar date.  That is

17  very highly relevant information because then we can

18  search for -- either through Mercedes Benz or whoever else

19  they sold it to, for invalidating activities.

20             That information has never been provided, and

21  that was the main area that we sought through our meet and

22  confer for this interrogatory.

23             THE COURT:  So when you had the meet and confer,

24  you explained that kind of detail to Mr. Hannemann?

25             MR. LORELLI:  Your Honor, I couldn't explain

1   that detail at that time because we did not know at that time

2   that this Aerotwin wiper blade was sold in Europe prior to

3   the United States.

4           In fact, they didn't even tell us when this

5   blade was first sold in the United States until their

6   supplemental response, which was after our motion.

7           THE COURT:  Okay.

8           MR. LORELLI:  And it's always -- but it's always

9   been back to the same issue.  We need to know the

10  applications and the sales in Europe, because those are the

11  invalidating -- those sales could lead to many invalidating

12  uses and disclosures.

13          MR. HANNEMANN:  Your Honor, this is Mark

14  Hannemann again.  I just want, so the record is clear, to

15  point out again a point that we only made in a footnote in a

16  surreply, and maybe we should have -- given this

17  conversation, maybe we should have pointed it out.

18          There's two different products that both have

19  the Aerotwin name.  And what we're talking about here

20  is -- I, think that -- I think that CAP may be linking

21  dates together with the wrong product because they don't

22  understand which design is when.  And, of course, that's a

23  fair subject of discovery, and I'm happy to discuss it

24  with them.

25          THE COURT:  Okay.  Very good.

34

1          What's next, Mr. Halan?

2          MR. HALAN:  Yeah.  I just want to make a

3   comment, that that kind of highlights the point why we need

4   the documents.  Opposing counsel is saying --

5          THE COURT:  That -- yes.  What it really

6   highlights, maybe, is a need to meet and confer.  So that's

7   my perspective on it.

8          What's the next issue, Mr. Halan.

9          MR. HALAN:  It's interrogatory number 4, Your

10  Honor.  The very next interrogatory.  It's page 6 to 7.

11         THE COURT:  Okay.

12         MR. HALAN:  Now, this is where we ask for a

13  variety of information regarding Beam wiper blades in

14  general.  And, again, this goes beyond what's covered by the

15  patents-in-suit.

16         THE COURT:  Yes.  This is kind of an interesting

17  one.  And I just have a question that I wanted to ask off the

18  top here.

19         Interrogatory 4D asks for the three most

20  knowledgeable persons regarding the first manufacture, sale,

21  offer for sale of each product.

22         Is there some reason that you were asking for

23  three?

24         MR. HALAN:  I guess there's no hard-and-fast

25  reason.  It's just the way we've done things here for a

1   number of -- for a long time, I guess.

2          THE COURT:  Just from a practical standpoint,

3   why?  I've never seen this kind of formatting before, where

4   you ask for the three most knowledgeable persons.

5          MR. HALAN:  Again, Your Honor, I guess there is

6   no rhyme or reason to it.  It's just been a practice we've

7   followed for a number of years.  It's just to get a number of

8   different people -- we don't just ask for one person because

9   we may want to depose a second person to see whether the

10  stories conflict or not.

11         THE COURT:  Why don't you just do, then, a

12  deposition notice under 30(b)(6) for the person most

13  knowledgeable?  And then you'll get as many as you need.

14  Because it might be ten as opposed to three.

15         MR. HALAN:  Well, one of the problems there,

16  Your Honor, is that a lot of this information, again, is in

17  the -- has -- it has -- the German company has it.

18         THE COURT:  I understand.  I was just curious.

19         Go ahead, please.  Talk about number 4.

20         MR. HALAN:  Anyways, with regard to number 4,

21  they have identified two people.  I'm not really too

22  concerned about the identification of people.  We're more

23  concerned with the information.

24         And the response on page 7, they've limited

25  their response to products -- such Beam products sold in

1   the United States and covered by the patents-in-suit.

2           Well, first of all, our requests -- or this

3   interrogatory goes beyond what's covered by the

4   patents-in-suit.  It goes to Beam Wiper Blades in general.

5           And, again, we're seeking information not just

6   in the U.S., but what's happening overseas.

7           THE COURT:  Okay.  And this came out in the meet

8   and confer?

9           MR. HALAN:  Yes.

10           THE COURT:  And what was the response in the

11   meet and confer?

12           MR. HALAN:  Their response -- again, this is --

13           THE COURT:  Not in a letter, not in a response.

14   What was the conversation in the meet and confer?

15           MR. LORELLI:  Again, Your Honor, it goes back to

16   the German -- the GmbH --

17           THE COURT:  Who's speaking?

18           MR. LORELLI:  They're only providing --

19           THE COURT:  Who is speaking?  Who is speaking?

20           MR. LORELLI:  Oh, I'm sorry, Your Honor.  This

21   is Marc Lorelli.

22           THE COURT:  Yes.  We really need you to identify

23   yourselves.  You know, we've got a large cast here, and the

24   recorder cannot keep track of you without identification.

25           MR. LORELLI:  I apologize, Your Honor.

37

1                THE COURT:  Go ahead, Mr. Lorelli.

2                MR. LORELLI:  It comes back to the same

3    statement that was told to us for all of the requests, in

4    that the GmbH would provide only documents for -- related to

5    the patents-in-suit.  And this, of course, is an

6    interrogatory that seeks information regarding Beam blades

7    and not just the patents-in-suit.

8                THE COURT:  All right.  So it sounds like

9    there's been a shift from that conversation.  When did that

10   take place?

11               MR. LORELLI:  We just learned of it today, Your

12   Honor.

13               THE COURT:  Mr. Lorelli?

14               MR. LORELLI:  Yes, it's Mr. Lorelli.

15               THE COURT:  When did the conversation take place

16   where the plaintiffs were saying they would not produce

17   anything from GmbH on this particular topic in request

18   number -- interrogatory number 4?

19               MR. LORELLI:  It was -- it was -- I believe it

20   was just prior to April 28th, Your Honor.

21               MR. GINSBERG:  Your Honor, this is Jeff

22   Ginsberg.  If Mr. Lorelli is referring to a conversation he

23   had with me, I don't recall that.

24               THE COURT:  Okay.

25               MR. LORELLI:  Your Honor, Mr. Ginsberg's letter

1    of April 29th recognizes that and also states for

2    interrogatory number 4 that they served a supplemental

3    response concurrently herewith.

4              And that, of course, was only focused on the

5    patents-in-suit and didn't have the U.S. -- I'm sorry, the

6    European information.  It's been the same issue that

7    permeates through all of these requests.

8              THE COURT:  Okay.  Anything further in regard to

9    number 4?

10             MR. HALAN:  It don't think so, Your Honor.

11             THE COURT:  Mr. Halan, what's next?

12             MR. HALAN:  Next is interrogatory number 5.

13             THE COURT:  And what's the issue here?

14             MR. HALAN:  This is directed to prefiling

15   disclosures.  So this would be disclosures by the inventors,

16   whoever else worked on developing these alleged inventions,

17   and disclosures -- disclosures made by the inventors to

18   others who worked with them and to any other outside

19   persons.

20             And Bosch's response was that they were not

21   aware of any public use, sale, or offer for sale.

22             But we weren't just limited -- we were not

23   limiting our request to that.  We were asking for any

24   disclosure whatsoever.  And we're not limiting it to

25   just -- obviously not just the U.S.  This information

1    would come from the German parent company.

2              Now, Bosch, since our motion, said they've

3    tried to find documents, and they've -- I think they said

4    they weren't able -- yeah, they agreed to search their

5    files and produce all documents evincing any such

6    disclosures.  And I don't think they've found any.

7              But this is information that they should have,

8    if not in a document -- again, the German company employs

9    the inventors.  And this is information the inventors,

10   they could just ask the inventors and get the information,

11   so we could determine whether a person -- we may want to

12   seek discovery from.

13             THE COURT:  Mr. Halan?

14             MR. HALAN:  Yes, Your Honor.  Bosch is not aware

15   of any such disclosures and, as CAP's counsel indicated, has

16   already agreed to search for documents that would show such

17   disclosures or refresh anybody's recollection.  If there are

18   any such documents in the batch of documents we just received

19   from GmbH, they will be, you know, reviewed and either

20   produced or logged.

21             THE COURT:  Okay.  And that's consistent, then,

22   with the response to interrogatory number 5, Mr. Halan, isn't

23   it?

24             MR. HALAN:  Well, again, they've -- no, they've

25   never taken the position that they have no information

1  whatsoever.  They just wouldn't go to the German company and

2  talk to the inventors and see if there -- here's -- Your

3  Honor, I find it incredibly hard to believe that these

4  inventors are working in a company developing new technology

5  and they don't talk to anybody about it and they don't get

6  involved with anybody else in developing it.  It's just

7  common occurrence in a company that they would involve others

8  in the development of these things.

9          THE COURT:  And who are they likely --

10         MR. HALAN:  If nothing else, just would be a

11 draft person or help to make them a prototype or some

12 testing.  I can't imagine these people working in some

13 sanitary post somewhere and not exposed to anybody else at

14 all.

15         And they would have that information, not us.

16         THE COURT:  All right.  You're assuming there's

17 some documentation or record that would preserve that, or

18 that the memories would still have it?

19         MR. HALAN:  Yeah, I'm --

20         THE COURT:  Right?

21         MR. HALAN:  What I'm saying is their memories

22 have not been questioned.

23         THE COURT:  Oh, okay.

24         MR. HALAN:  As far as we know.

25         THE COURT:  And you confirmed that in your meet

1  and confer?

2           MR. HALAN:  I don't know if that was -- I don't

3  know if that was addressed, specifically, but it was

4  confirmed by the fact they refused -- first of all, they

5  limited their response, and they refused to budge from that

6  position.

7           THE COURT:  Well, the response says they're not

8  aware of any public use, sale, offer for sale of any

9  inventions disclosed in the patents-in-suit prior to the

10  filing date hereof.

11           That's reading directly from the response to

12  interrogatory number 5.  Which seems to be consistent with

13  what they're now saying.

14           So I don't even see any distinction in the

15  response between the German company and the GmbH and LLC.

16           MR. HALAN:  Well, Your Honor, here's the

17  problem.  Because in that answer, they're talking about

18  they're not aware of any public use, sale or offer for sale.

19           Again, our request -- our interrogatory was

20  directed to any disclosure whatsoever.

21           THE COURT:  Okay.

22           MR. HALAN:  And, again, it may not --

23           THE COURT:  So then -- so then in the meet and

24  confer you say, look, our question is a lot broader than what

25  your response is.  Let's talk about that and how we can see

42

1  if we can find if there's anything there.

2          And my question to you was, tell me about that

3  meet and confer conversation.  And I'm not hearing

4  anything.  In fact, you said you may not have discussed

5  that.

6          Am I hearing things correctly?

7          MR. LORELLI:  Your Honor, this is Marc Lorelli,

8  and you are correct.

9          I would like to note when we got to this issue,

10  again, it was the GmbH versus LLC position that they were

11  standing upon that, unfortunately, would have made that

12  discussion irrelevant because they were not producing

13  information from the GmbH.

14          THE COURT:  Well, obviously, somewhere along the

15  way in either the 800,000 documents or because of a change of

16  heart, things have shifted, and things are now being produced

17  from GmbH; and, in fact, a series of searches have been

18  accomplished at GmbH.  Two so far.  And a third apparently is

19  underway.

20          So I'm a little stumped as to -- you know, meet

21  and confer might have produced a little more information here

22  than you've been getting or thought you had.

23          MR. LORELLI:  Yeah.  Your Honor, this is Marc

24  Lorelli.  And I guess we would be comfortable so long as we

25  know that this answer is from the knowledge of the GmbH as

43

1   well as the LLC.

2           THE COURT:  Okay.  Let's go ahead, Mr. Halan.

3   What's next?

4           MR. HALAN:  And, actually, Your Honor, I want to

5   point out that in our Exhibit Number 2, which is the letter

6   that Marc Lorelli wrote after the conference, he points out

7   in there that it was the position of Bosch that that request

8   was overbroad and they weren't going to provide the

9   information.

10           MR. HANNEMANN:  And, Your Honor, if we're going

11   to -- this is Mark Hannemann.  If we're going to exhume the

12   correspondence, then we should point out that the next day we

13   wrote to CAP's counsel and indicated, specifically, with

14   respect to interrogatory number 5 that Robert Bosch GmbH has

15   agreed to search its files and produce all documents evincing

16   any disclosures of the subject matter of the claims, et

17   cetera.  So that was the very next day.

18           THE COURT:  Thank you.

19           What's next, Mr. Halan?

20           MR. HALAN:  Interrogatory number 6, Your Honor.

21           THE COURT:  What's the issue here?

22           MR. HALAN:  Well, this was directed to documents

23   regarding the conception and reduction of practice to the

24   invention.

25           Bosch has since taken the position that they

44

1   don't have any such documents, so they're not going -- but

2   let me just read my notes here.

3                THE COURT:  Have you since received any

4   information?  This is an interrogatory.  Have you received

5   any response or documents that would answer this

6   interrogatory?

7                MR. HALAN:  Well, no.  It's their position since

8   then that they don't have any such documents and that they're

9   going to take the position that the conception and reduction

10  of practice dates are no earlier than the filing dates.

11               THE COURT:  Okay.  If that's the response,

12  that's the response, right?

13               Mr. Hannemann, anything on this issue?

14               MR. HANNEMANN:  I'm sorry, Your Honor, was that

15  to Mr. Hannemann or Halan?

16               THE COURT:  Mr. Hannemann?

17               MR. HANNEMANN:  Yes.  As presently informed,

18  neither Bosch entity has invention records and the other

19  kinds of documents that would prove up a conception date

20  earlier than the filing dates, so that's the dates we've

21  asserted in the supplemental interrogatory response and

22  pointed that out.

23               THE COURT:  Thank you.

24               Mr. Halan, what's next?

25               MR. HALAN:  I guess, Your Honor, I guess the one

1   subsidiary issue with that, again, is the fact that during

2   the meet and confers there was a refusal to conduct

3   investigation from the parent company.  And while there may

4   not be documents pertaining to inception or reduction of

5   practice, I would assume that the inventors would have some

6   of the information requested, just from their memories.

7   Maybe not.  But it was their position they wouldn't --

8            THE COURT:  I appreciate your assumption.  But

9   if the response is there's no documents, I can't order them

10  to produce something they don't have.

11           The one way around that is you can go take some

12  depositions, and perhaps that's what you'll have to do.  And

13  if somebody kept some notes or a logbook or something that

14  gives earlier information, you'll be able to find or identify

15  that and then decide whether or not it needs to be produced.

16           MR. HANNEMANN:  And, Your Honor, this is Mark

17  Hannemann again.  Bosch GmbH is voluntarily making the

18  inventors, at least those who still work for Bosch, available

19  for deposition in the United States.

20           THE COURT:  Thank you.

21           Mr. Halan, what's next?

22           MR. HALAN:  Last is interrogatories 8 and 9,

23  Your Honor.

24           THE COURT:  Okay.  What's the issue here?

25           MR. HALAN:  These were directed to certain -- I

1  guess I would call them numerical parameters regarding prior

2  blades in general.

3          And Bosch has taken the position that they

4  wouldn't -- they wouldn't provide any information

5  regarding -- I'm sorry.  Excuse me.  Yeah.  They would not

6  provide information for -- I'm sorry.  Their first answer

7  is they were not aware of any public sales, offer for sale

8  of any of the inventions claimed prior to the effective

9  filing date.

10         THE COURT:  You're breaking up again.  I don't

11  know if you're moving away from the phone system or what's

12  happening.

13         MR. HALAN:  Yeah.  Let me start all over, Your

14  Honor.

15         THE COURT:  Okay.  Interrogatories 8 and 9.

16         MR. HALAN:  Yeah.  And, again, these are

17  directed to certain numerical parameters regarding wiper

18  blades in general.

19         And Bosch's response is that we're not aware

20  of any sale of the inventions claimed prior to the

21  invention date.

22         And, again, this interrogatory was not limited

23  to just inventions claimed.  So it's directed to claims,

24  as generally defined within the interrogatories, and then

25  the numerical parameters associated with those claims.

47

1          THE COURT:  Okay.  Now, in regard to 8 and 9,

2    there's a lot of detail in the responses here as to the '926

3    patent and then the '698 patent.

4          Mr. Halan, tell me a little bit about the meet

5    and confer and how it went when you tried to meet and

6    confer and expand to the responses.

7          MR. HALAN:  Hello?

8          THE COURT:  Yes.

9          MR. HALAN:  I'm sorry.  This is John Halan.  I

10   wasn't hearing anything.

11         THE COURT:  Oh, okay.  My comment was that it

12   looks like the responses to interrogatory 8 and 9 give pretty

13   good detail regarding the '926 patent and the '698 patent.

14   I'm kind of curious what the meet and confer conversation was

15   in light of the detailed responses.

16         MR. LORELLI:  Your Honor, this is Marc Lorelli

17   to speak to the meet and confer.  These two interrogatories

18   were discussed in detail, and how these interrogatories --

19         THE COURT:  Can you speak up a little bit or get

20   closer to the microphone.  We're losing the signal on you.

21         MR. LORELLI:  Certainly, Your Honor.  We

22   discussed how these interrogatories were mirrored after the

23   claims -- or Claim 1 of the '698 patent and the other

24   interrogatory Claim 1 of the '926 patent.

25         The interrogatory is very specific in that it

1  focuses on just the type of wiper blades that are claimed

2  in the preamble of these claims.  And then it asks for

3  certain technical information with regards to such wiper

4  blades.

5          We discussed that.  I recorded -- and Bosch

6  said that they would not be supplementing their

7  interrogatory responses.  I recorded that in my letter of

8  April 28th.

9          And on April 29th, Bosch wrote back confirming

10  that they were maintaining their objections.

11          And it was only until after we filed our

12  motion to compel that they supplemented those responses.

13  But, again, the supplementation does not answer the

14  interrogatories.

15          MR. HALAN:  Your Honor, this is John Halan.  One

16  more note.  Not only does it not answer the interrogatories,

17  the documents that they've identified in that supplemental

18  response relate to again the Variflex blade, which is the

19  pre-1996 blade.  They gave us -- they didn't give us any

20  information --

21          THE COURT:  We're losing your connection again.

22  I don't know what it is, but, Mr. Halan, you and Mr. Lorelli

23  are going to have to speak up or be closer to the microphone.

24  It sounds like you're drifting away or something.

25          MR. HALAN:  Again, Your Honor, the information

49

1   they did provide in those supplemental responses, again after

2   we had to file our motion to compel, were only directed to

3   the Variflex blades, the blades that were developed 1996 and

4   earlier.  The blades that are critical in this case, the

5   Aerotwin blades, were not part of that answer.

6              And even as to the Variflex blade information,

7   they did not provide information responsive to the

8   interrogatory.

9              THE COURT:  Mr. Hannemann?

10             MR. HANNEMANN:  Yes, Your Honor.  On April 29th,

11  we wrote to CAP's counsel.  We did note that Bosch maintains

12  its objections to the interrogatories, that's true.  But in

13  the next sentence we wrote:  In any event, as noted above,

14  Robert Bosch GmbH has agreed to search for and produce, et

15  cetera, documents.

16             And those documents are reflected in our

17  supplemental interrogatory response where we specifically

18  identify documents that relate to our development work and

19  to the prototype blade that we were aware of and

20  understood to be the subject of the interrogatory.

21             We do not, in our interrogatory response, have

22  a table with all of the technical parameters for each one

23  of these different prototypes because we don't know what

24  those are.  We don't have the prototypes.  And I don't --

25  those that we do have I don't think we need to test.  CAP

1    can do that as well as we can.  But we did produce all the

2    technical documents that we had from the time.

3                Now, in parentheses I would note that counsel

4    is correct that there is -- you know, there are documents

5    relating to this Variflex blade that was the subject of

6    Bosch's joint development work in the early '90s.  The

7    failure of that project -- that project failed in the

8    mid '90s, and Bosch, from then on, was doing in-house

9    development work.

10                I don't know whether that answers any of CAP's

11   questions about the different document trails, but the

12   Variflex was a joint project, then the rest of the

13   development work was Bosch alone.

14                THE COURT:  Mr. Halan, anything further?

15                MR. HALAN:  Well, Your Honor, I just have one

16   comment.  Opposing counsel, again in their Exhibit 3 letter,

17   said they were maintaining their objections to these

18   interrogatories.

19                He did in the next sentence say he would

20   produce documents.  But that sentence says:  Pertaining

21   only to the designs described in the patents-in-suit.

22                And, again, that was the problem throughout

23   these discussions.  They were limiting their responses to

24   designs of the patents-in-suit.  Our interrogatory goes

25   beyond that.

51

1      So they said they were going to maintain their

2  objections, they weren't going to give us what we needed,

3  and that's why we had to file a motion to compel.

4           THE COURT:  Anything further by anyone?

5           MR. HALAN:  Well, Your Honor, I guess opposing

6  counsel, for the first time today, disclosed that they have

7  prototypes too.  We'd like to have all this -- everything

8  we've asked for that these prototypes would be responsive to,

9  we'd like to have that information and have access to the

10  prototypes themselves.

11           THE COURT:  Who is speaking?

12           MR. HALAN:  This is John Halan again, Your

13  Honor.

14           THE COURT:  Thank you.

15           Anything further in regard to the motion

16  today?

17           MR. HANNEMANN:  Not from the plaintiff, Your

18  Honor.

19           MR. HALAN:  Nothing here, Your Honor.  John

20  Halan.  Nothing for CAP America.

21           THE COURT:  Okay.  What I'm going to do in

22  regard to this, it will be the order of the Court that the

23  motion to compel, which is number 47, is denied at this time.

24           The Court finds that the meet and confers have

25  been inadequate to address all of the issues.

1        Also, it's interesting that in the paper trail

2   here of the letters, within a day after one letter that

3   the plaintiff points to as compelling the need for the

4   motion, there's a -- the day after there's more response

5   that says some of these things are going to be searched

6   out.

7        I'm also concerned that at the time the motion

8   was filed, the plaintiff -- or the defendant had not even

9   been able to access the documents that were produced and

10  so couldn't even speak to what they had received.

11       So, clearly, to the Court, it appears that the

12  motion was premature and that there should have been more

13  effort to try to meet and confer and to resolve the

14  differences as well as search those documents provided.

15       Let me ask this.  Any chance of settling this

16  case?

17       MR. LORELLI:  Your Honor, this is the

18  defendant.  We raised that issue in our first call with

19  the other side, and I'd like to, I guess, hear their

20  response.

21       MR. HANNEMANN:  Your Honor, my understanding is

22  that CAP is not willing to stop infringing and, under those

23  circumstances, I don't believe that there is a settlement

24  that is likely.

25       But we are happy to -- you know, we're happy to

53

1    discuss anything.

2                 THE COURT:  Okay.  Very good then.  Thank you so

3    much.  Have a good holiday weekend, everybody.

4                 We'll be in recess.

5                      (The proceedings were concluded at

6                      11:15 a.m.)

7                              *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

54

1                                -o0o-

2          I certify that the foregoing is a correct

3      transcript from the electronic sound recording

4      of the proceedings in the above-entitled matter.

5

6      _____        7/13/11

7      Donna Davidson, RDR, CRR, CCR #318        Date
       Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25